FILED _____ _____ ENTERED
_____ LOGGED _____ RECEIVED

OCT 2 3 2020

AT GREENBELT
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
DEPUTY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH OF | * | |
| A GOLD IPHONE 11 CURRENTLY | * | CASE NO.   GLS-20-2331 |
| LOCATED AT THE ATF | * | |
| HYATTSVILLE II FIELD OFFICE, | * | **UNDER SEAL** |
| GREENBELT, MARYLAND 20770 | * | |
| | ******* | |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Jeremy Bourget, Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), being duly sworn, depose and state the following:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 authorizing the examination of property—a cellular telephone described herein and in Attachment A (the "**TARGET DEVICE**")—which is currently in law enforcement possession, and the extraction from that property of electronically stored information, further described in Attachment B.

2.      As an ATF Task Force Officer (TFO), I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

3.      I have been a member of the Prince George's County Police Department (PGPD) for more than five years and am currently assigned to the Gun Intelligence Unit.  In April of 2018, I was detailed to the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) Hyattsville II Task Force where I was sworn and deputized as a Task Force Officer for ATF.

1

4.      During my tenure as a law enforcement officer, I have been the lead investigator on more than 50 narcotics and weapons-related arrests and have assisted with dozens of others.  I specialize in investigating violations of narcotics and firearm laws in Maryland and the United States, and am familiar with the methods narcotics traffickers use to traffic narcotics and firearms in the District of Columbia metropolitan area.  I am responsible for investigations involving specified unlawful activities, to include violent crimes involving firearms that occur in Prince George's County.  I am also responsible for enforcing federal firearms and explosives laws, and investigating other unlawful activities, to include narcotics trafficking and firearms trafficking, occurring in Prince George's County, Maryland.  I received training on the proper investigative techniques for these violations through the Prince George's County Basic Investigator School and ATF Task Force Officer training.  I have actively participated in investigations of criminal activity, including but not limited to, the investigation of armed drug traffickers and violent gun crimes.  I have also personally conducted and participated in investigations that have resulted in the arrests and convictions of individuals responsible for trafficking narcotics and firearms, and have testified under oath about my investigations and findings.  I have also been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; executing search warrants of electronic devices and social media which resulted in evidence of the aforementioned violations; and executing search warrants and arrest warrants, which resulted in seizures of illegal narcotics, firearms, and other narcotics contraband.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other investigators and witnesses.  This affidavit is

intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.      Based on my training and experience and the facts, as set forth in this affidavit, there is probable cause to believe that the **TARGET DEVICE** contains evidence of firearm and narcotics offenses. Specifically, there is probable cause to believe that there is presently found within the **TARGET DEVICE** evidence of violations of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm and ammunition), 18 U.S.C. § 924(c) (possession of a firearm in the furtherance of a drug trafficking crime), and 21 U.S.C. § 841 (possession with intent to distribute a controlled substance) by **JAMMAL FITZGERALD COSTON** ("**COSTON**").

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

7.      As listed in Attachment A, the **TARGET DEVICE** to be searched is:

   (a)    a gold iPhone 11 in ATF custody as property number #000012 under case
          761050-20-0024

8.      The **TARGET DEVICE** is currently in law enforcement's possession at ATF Hyattsville II Field Office in Greenbelt, Maryland 20770.  In my training and experience, I know that the **TARGET DEVICE** has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the **TARGET DEVICE** first came into the possession of law enforcement.

## PROBABLE CAUSE

9.      During the course of my investigation into gun offenders, I became aware that **COSTON** had an open warrant for Failure to Appear through Prince George's County Sheriff's Office that had been issued on January 17, 2020 (D19063740-3). **COSTON** had reported his address as a known apartment located in Temple Hills, Maryland ("the Temple Hills apartment"),

while filing a robbery report on January 17, 2020.

10.     **COSTON** is prohibited from possessing firearms and ammunition due to prior felony convictions, including a 2019 conviction for Carrying a Pistol Without a License (Outside Home or Place of Business) and a 2019 conviction for Attempt to Commit Robbery in the Superior Court of the District of Columbia.

11.     On January 30, 2020, Prince George's County Police Department Sergeant Genung and I established surveillance outside the apartment building in which the Temple Hills apartment is located. At approximately 8:45 a.m., I observed **COSTON** exit the apartment building carrying a white trash bag. **COSTON** opened the door to a black Mercedes bearing Virginia registration ULU7453 and placed the white trash bag in the right rear-passenger side of the vehicle. I approached **COSTON** and identified myself as a police officer while wearing a ballistic vest with police markings. **COSTON** immediately fled on foot. I gave chase and observed **COSTON** reach into his waistband with his left hand and throw a handgun to the rear of the apartment building. While continuing to chase **COSTON,** I observed him throw and abandon a cellphone in the parking lot behind the apartment building. I apprehended **COSTON** a short distance away and returned to recover the cellphone I had observed **COSTON** throw. Sgt. Genung located and recovered a silver and black Glock 17 handgun loaded with eight (8) 9mm rounds in the area where **COSTON** had thrown the handgun.

12.     Upon returning to the black Mercedes bearing Virginia registration ULU7453, officers detected a strong odor coming from the vehicle, which they knew from training, knowledge, and experience to be fresh marijuana. Officers recovered the white trash bag from the rear-right seat. The white trash bag contained baggies of suspected marijuana. Laboratory analysis subsequently confirmed that approximately 131.3g of marijuana was recovered from the vehicle.

Based on training and experience, I know that this quantity of marijuana prepared in multiple equal-sized baggies, in conjunction with a handgun, is indicative of possession with intent to distribute narcotics.

13.     At this time, I obtained a search warrant for **COSTON**'s residence, the Temple Hills apartment, from the Circuit Court for Prince George's County, Maryland.   During the execution of this warrant, Prince George's County Police Department detectives recovered additional evidence of marijuana distribution and possession of firearms and ammunition, including digital scales, narcotics packaging materials with traces of suspected marijuana, baggies containing 20.4g of suspected marijuana, seven (7) rounds of 9mm ammunition, and $1,100 in US currency.

14.     During the course of the investigation, I identified the Instagram account "slgshootaa".   Multiple selfie-style videos and photos of **COSTON** were posted to the "slgshootaa" account, along with comments indicating the account belongs to the individual in the videos and photos.  As a result, I believe that **COSTON** controls the account.

15.     While monitoring the "slgshootaa" Instagram account during the course of the investigation, I observed videos posted to the account's Instagram story that showed **COSTON** with what appeared to be firearms and suspected marijuana.[1]  For example, on November 8, 2019, a series of videos were posted to the account's Instagram story that showed **COSTON** in a vehicle; a handgun and bag of suspected marijuana in the floorboard of a vehicle, next to a set of keys

---

[1] An Instagram "story" is a series of videos and photos a user can post on their account which only remains visible for 24 hours.

containing a Mercedes key; and **COSTON** smoking a suspected marijuana cigarette.  Screenshots from these videos are shown below:



16.    Following **COSTON**'s arrest on January 30, 2020, I continued to monitor "slgshootaa" Instagram account.  On April 22, 2020, a video was posted to the account's Instagram story that showed a black handgun lying on a floor and a hand holding a suspected marijuana cigarette.  Below is a screenshot taken of this video:



17.     On May 27, 2020, at approximately 8:30 p.m., a video was posted to the "slgshootaa" account's Instagram story showing a large heat-sealed bag containing a green leafy substance suspected to be marijuana. In your affiant's training and experience, based on its apparent size, this bag would contain approximately one pound of marijuana.   Below is a screenshot taken from this video showing the suspected marijuana:



18.     On June 2, 2020, another video was posted to the "slgshootaa" account's Instagram story. **COSTON** appeared to be filming the video while seated in a vehicle. **COSTON** first showed what appeared to be a black handgun resting on his lap. **COSTON** then pointed the handgun at the video camera so that the barrel of the handgun was visible. **COSTON**'s face was plainly visible in this video. In viewing this video, I did not see any orange markings or smaller interior barrel that would indicate the gun was a replica or BB gun. Below is a screenshot taken from this video showing the suspected handgun and **COSTON**'s face:



19.     I am aware that Instagram can be accessed by smartphone applications, such as the Instagram application of the same name.  Instagram allows its users to share media (pictures and video) taken on a smartphone through its content-sharing platform.

20.     On June 11, 2020, detectives with the Prince George's County Police Department executed a warrant, issued by the Circuit Court for Prince George's County, to search **COSTON**'s residence, the Temple Hills apartment.  Upon entering the residence, members of the Prince George's County Police Department Emergency Services Team ("EST") encountered **COSTON**

9

exiting the bedroom with a handgun in his hand.  **COSTON** dropped the handgun on the floor of the hallway.  It was later recovered and identified as a Springfield XD .45 semi-automatic pistol, loaded with six rounds of .45 caliber ammunition.

21.     In addition to the firearm, pursuant to the warrant, detectives seized from **COSTON**'s apartment, among other items, suspected marijuana, plastic baggies, digital scales, and $17,369 in cash.  Laboratory analysis subsequently confirmed that approximately 274.1g of marijuana was recovered from the residence during this search. Based on my training, knowledge, and experience, I know that this quantity of marijuana is not for personal use, and that plastic baggies and digital are items used in the distribution of marijuana. Additionally, I know that drug traffickers frequently keep firearms to protect their product and proceeds. I also know that drug dealers often keep large amounts of cash as proceeds from their sales due to attempting to hide it from taxation and to limit drawing attention to suspicious activity of large volumes of unexplained cash deposits. I believe $17,369 is a quantity of cash most people would not keep in their house, and that it is suggestive of drug distribution.

12.     On August 31, 2020, the United States District Court for the District of Maryland issued an arrest warrant for **COSTON** for violations of 18 U.S.C. § 924(c), 18 U.S.C. § 922(g), and 21 U.S.C § 841(a)(1) in Case No. PX 20-cr-282.

13.     On September 9, 2020 members of the ATF Hyattsville II Task Force observed **COSTON** at the Shell Gas Station at 4700 South Capitol Street SE, Washington, DC 20032 (the "Shell Gas Station").  **COSTON** was on GPS monitoring as a result of his probation supervised by the District of Columbia Court Services and Offender Supervision Agency ("CSOSA"), and **COSTON**'s GPS history frequently placed him in the area of 4700 South Capitol Street SE.  In addition, I have reviewed Instagram videos posted by **COSTON** in which **COSTON** showed and

tagged the Shell Gas Station, and Instagram messages in which **COSTON** discussed selling marijuana and told people to come to the Shell Gas Station. According to police reports, on April 4, 2020, officers with the Metropolitan Police Department ("MPD") in the District of Columbia observed **COSTON** conduct a hand to hand transaction at this location, and then stopped **COSTON** and found him to be in possession of suspected marijuana. Therefore, based on this investigation, I believe that **COSTON** uses the location of the Shell Gas Station to distribute marijuana.

14.      After observing **COSTON** at the Shell Gas Station on September 9, 2020, officers observed **COSTON** enter the driver seat of a black Audi Q5 bearing Virginia registration UHM6609. Officers followed the vehicle and activated their emergency lights in the 1100 block of Southview Drive, Oxon Hill, Maryland, 20745.  Officers took **COSTON** into custody based on the arrest warrant without incident. When he was encountered by law enforcement, **COSTON** was holding the **TARGET DEVICE**.

15.      I read **COSTON** his *Miranda* rights in the presence of Special Agent Szakolczai, and **COSTON** verbally acknowledged understanding these rights. **COSTON** stated that there was nothing in his vehicle and gave verbal consent to search the vehicle. A search of the vehicle revealed multiple large heat-sealed bags that I know through training, knowledge, and experience are used to package narcotics. The bags contained flakes of a green leafy substance suspected to be marijuana. Officers also recovered a digital scale and a bag containing 12.5 grams of a green-leafy substance.  Based on training, knowledge, and experience, I believe this substance to be marijuana. **COSTON** later admitted that the marijuana was his "for smoking." Based on the several empty heat-sealed bags with the marijuana residue, the bag of suspected marijuana, and the digital scale in **COSTON's** possession while **COSTON** was at a location where he is known

to distribute marijuana, I believe that **COSTON** is still engaged in the illegal distribution of marijuana.

16.    While I transported **COSTON** to the Federal Courthouse in Greenbelt, Maryland, **COSTON** also stated that the **TARGET DEVICE** was his, and asked me to write down several phone numbers for him from the **TARGET DEVICE**. While obtaining the phone numbers that **COSTON** had requested from the **TARGET DEVICE**'s list of recent calls, I observed a missed call from the contact "Perk Nan." I know from training knowledge and experience that "Perks" is a slang term for Percocets, and I believe that **COSTON** was in communication with an individual with the contact name "Perk Nan" to buy or sell Percocets, a Schedule II controlled dangerous substance.

<u>**SEARCH OF THE TARGET DEVICE**</u>

17.    Based on my training and experience, consultation with other law enforcement officers experienced in investigation regarding narcotics trafficking and the forensic analysis of digital media, I have learned the following:

    a.    It is common for individuals who utilize cellular telephones in furtherance of their drug trafficking activities, to maintain on their cellular telephones electronically stored data related to the activity, such as, contact lists, names, phone numbers, text messages, photographs, videos, notes, email and documents.

    b.    I know that cellular telephones store voice mail messages, names, telephone numbers, addresses, sent and received text messages, and video, and images on their digital memory.

    c.    I know that when individuals are involved in illegal firearm and ammunition possession, they often use cellular telephones to facilitate their acquisition of firearms, firearm paraphernalia, and ammunition and that these individuals use telephones to thwart law enforcement efforts, often using coded language to describe and refer to these items.  This can include conducting internet searches for firearms and firearm-related parts using cellular telephones.  Such individuals often utilize cellular applications

and/or exchange text messages with other individuals in reference to the purchase, sale, and use of firearms. Accordingly, they keep text messages, emails, and other records of electronic communications on their cellular phones related to the transactions to obtain such firearms, firearm paraphernalia, and ammunition.

d.    Similarly, I know that that drug trafficking is an ongoing process, requiring the development, use, and protection of a communication network to facilitate daily narcotics distribution, and as such, narcotics traffickers commonly use coded language when speaking with other narcotics traffickers, use multiple cellular telephones, and frequently change their cellular telephone numbers in order to thwart detection by law enforcement agents who may be intercepting or attempting to intercept their communications. I also know through my training and experience that drug traffickers frequently transmit to one another prearranged codes, specifically to indicate the quantity and/or price of narcotics, or a predetermined code to identify the caller, and that narcotics traffickers commonly use coded language when speaking with other drug traffickers in order to thwart detection by law enforcement agents who may be intercepting their communications.

e.    I know that individuals involved in illegal possession of firearms and ammunition often use digital cameras, which are commonly-available as features on cellular telephones, to take photographs of firearms, firearm paraphernalia, and ammunition in their possession. They also often use video recording devices, which are commonly-available as features on cellular telephones, to take video recordings of firearms, firearm paraphernalia and ammunition in their possession.

f.    Additionally, it is common for individuals who utilize cellular telephones in furtherance of their illegal firearm and ammunition possession as well as narcotics trafficking to maintain on their cellular telephones electronically stored data related to the activity, such as contact lists, names, phone numbers, notes, emails, and documents, in addition to text messages, photos, videos, and evidence of other communications about firearms, ammunition, and controlled substances. Although individuals involved in illegal possession of firearms and ammunition as well as trafficking of narcotics regularly delete items from their telephones in order to conceal activities from law enforcement, deleted items can sometimes be recovered and the telephones also continue to reflect relevant information until it is deleted. Persons involved in illegal firearm and ammunition possession and narcotics trafficking frequently keep their cellular telephone on their person or in their home or vehicle, in order to have ready access to communications.

g.     A thorough search of digital media, such as the **TARGET DEVICE**, for evidence of instrumentalities of a crime commonly requires a qualified expert to conduct the search in a laboratory or other controlled environment. This is true for the following reasons:

    i.     Searching digital media is a highly technical process which requires specific expertise and specialized equipment. There are so many types of digital media in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with personnel who have specific expertise in the type of digital media that is being searched.

    ii.     Searching digital media requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Since such data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory or related facility, is essential in conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

18.     In searching for evidence, fruits, and instrumentalities of criminal activity within the **TARGET DEVICE**, the government will transport the **TARGET DEVICE** to an appropriate law enforcement facility for review to determine whether it contains evidence and instrumentalities of violations of federal law. The **TARGET DEVICE** and the contents thereof will be reviewed by appropriately trained personnel in order to extract and seize any data that relates to the fruits, instrumentalities, and evidence of violations of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm and ammunition), 18 U.S.C. § 924(c) (possession of a firearm in the furtherance of a drug trafficking crime), and 21 U.S.C. § 841 (possession with intent to distribute a controlled substance).

## TECHNICAL TERMS

19.     Based on my training and experience, I use the following technical terms to convey

the following meanings:

a.     Wireless telephone:  A wireless telephone (or mobile telephone, or cellular
telephone) is a handheld wireless device used for voice and data
communication through radio signals.   These telephones send signals
through networks of transmitter/receivers, enabling communication with
other wireless telephones or traditional "land line" telephones.  A wireless
telephone usually contains a "call log," which records the telephone
number, date, and time of calls made to and from the phone.  In addition to
enabling voice communications, wireless telephones offer a broad range of
capabilities.  These capabilities include: storing names and phone numbers
in electronic "address books;" sending, receiving, and storing text messages
and e-mail; taking, sending, receiving, and storing still photographs and
moving video; storing and playing back audio files; storing dates,
appointments, and other information on personal calendars; and accessing
and downloading information from the Internet.  Wireless telephones may
also include global positioning system ("GPS") technology for determining
the location of the device.

b.     Digital camera:  A digital camera is a camera that records pictures as digital
picture files, rather than by using photographic film.  Digital cameras use a
variety of fixed and removable storage media to store their recorded images.
Images can usually be retrieved by connecting the camera to a computer or
by connecting the removable storage medium to a separate reader.
Removable storage media include various types of flash memory cards or
miniature hard drives.  Most digital cameras also include a screen for
viewing the stored images.  This storage media can contain any digital data,
including data unrelated to photographs or videos.

c.     Portable media player:  A portable media player (or "MP3 Player" or iPod)
is a handheld digital storage device designed primarily to store and play
audio, video, or photographic files.  However, a portable media player can
also store other digital data.   Some portable media players can use
removable storage media.  Removable storage media include various types
of flash memory cards or miniature hard drives.  This removable storage
media can also store any digital data.  Depending on the model, a portable
media player may have the ability to store very large amounts of electronic
data and may offer additional features such as a calendar, contact list, clock,
or games.

d.     GPS:  A GPS navigation device uses the Global Positioning System to

15

display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

f.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

20.     Based on my training, experience, and research, I know that the items to be seized, further described in Attachment A, have capabilities that allow them to serve some or all of the above-described functions or store information relevant to those functions.   Additionally, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

21.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods.  Similarly, things that have been viewed via the Internet are

typically stored for some period on the device. This information can sometimes be recovered with forensics tools.

22.     There is probable cause to believe that things that were once stored on the **TARGET DEVICE** may still be stored there, for at least the following reasons:

    a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

    d.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

23.     *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **TARGET DEVICE** was used, the purpose of the use, who used it, and when. There is probable

cause to believe that this forensic electronic evidence might be on the **TARGET DEVICE** because:

    a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

    b.    Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.    The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.    Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

    24.    *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e) the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to

computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

25. *Manner of execution.*   Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.   Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

26. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **TARGET DEVICE** described in Attachment A to seek the items described in Attachment B.

Jeremy Bourget, Task Force Officer
Bureau of Alcohol, Tobacco, Firearms and Explosives
United States Department of Justice

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this _____17th_____ day of September, 2020.

Honorable Gina L. Simms
United States Magistrate Judge

19

## ATTACHMENT A
## ITEM TO BE SEARCHED

The property to be searched is the **TARGET DEVICE:**

   a.   a gold iPhone 11 in ATF custody as property number #000012 under case 761050-20-0024

The **TARGET DEVICE** is currently being stored at the ATF Hyattsville II Field Office in

Greenbelt, Maryland 20770.

## ATTACHMENT B

## ITEMS TO BE SEIZED

All records contained in the item described in Attachment A which constitute evidence of violations of 18 U.S.C. §§ 922(g)(1) and 924(c) and 21 U.S.C. § 841 involving **JAMMAL FITZGERALD COSTON** since October 1, 2019, as outlined below:

1. All:

  a. SMS/MMS/text messages, voicemail messages, emails, and other communications and notes regarding narcotics or firearms trafficking and/or possession of firearms and ammunition;

  b. Photographs, audio clips, video clips, and other audio, video, or image files depicting or relating to narcotics or firearms trafficking and/or possession of firearms and ammunition;

  c. Any information related to (i) sources of drugs or firearms, (ii) drug or firearms customers, and/or (iii) drug or firearms trafficking associates (including names, addresses, phone numbers, or any other identifying information), including but not limited to lists of drug customers, telephone contact lists, and incoming/outgoing/missed phone call log(s);

  d. Any information related to possession or usage of firearms, as well as ammunition and other firearm paraphernalia (e.g., magazines, body armor, etc.), including any image, video, or text file relating to such activities;

  e. Any information relating to types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

  f. Documentation of drug proceeds, including but not limited to bank records, checks, credit card bills, account information, and other financial records;

  g. Any records relating to the identity of the user of the "slgshootaa" Instagram account;

  h. Schedules or travels; and

  i. Historical cellphone location data, including but not limited to Global Position System (GPS) data, coordinates, waypoints, and tracks.

2.    Any and all records related to the location of the user(s) of the device.

3.    For the Device:

 a. Evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

 b. evidence of software that would allow others to control the Device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

 c. evidence of the lack of such malicious software;

 d. evidence of the attachment to the Device of other storage devices or similar containers for electronic evidence;

 e. evidence of counter forensic programs (and associated data) that are designed to eliminate data from the Device;

 f. evidence of the times the Device were used;

 g. passwords, encryption keys, and other access devices that may be necessary to access the Device;

 h. documentation and manuals that may be necessary to access the Device or to conduct a forensic examination of the Device;

 i. contextual information necessary to understand the evidence described in this attachment.

With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

1.  surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

2.  "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

3.  "scanning" storage areas to discover and possible recover recently deleted files;

4.  "scanning" storage areas for deliberately hidden files; or

5.  performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

6.  If after performing these procedures, the directories, files or storage areas do not reveal evidence of the specified criminal activity, the further search of that particular directory, file or storage area, shall cease.

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable.  If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review.  The investigative team will take no further steps regarding any review of information so segregated absent further order of the court.  The investigative team may continue to review any information not segregated as potentially privileged.